**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JANE DOE, Individually and as the legal guardian of JOHN DOE, a Minor, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil No. 19-cv-3052 |
| v. | ) ) | |
| TOWNSHIP HIGH SCHOOL DISTRICT No. 214, | ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

Plaintiff, JANE DOE, individually and as the legal guardian of JOHN DOE, a minor, by and through undersigned counsel, hereby for her Complaint against the Township High School District No. 214 ("District 214"), for violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a), 34 C.F.R. Part 104, and intentional infliction of emotional distress, states as follows:

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over Counts I and III of this action pursuant to 28 U.S.C. § 1331 as the Plaintiff's claims alleged herein arise under the Rehabilitation Act (the "Rehabilitation Act"), 29 U.S.C. § 794, *et seq.* This Court has supplemental jurisdiction over Count II of this action pursuant to 28 U.S.C. § 1367.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Defendant resides in this district and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

**PARTIES**

3.　　Plaintiff JANE DOE is the natural mother and legal guardian of JOHN DOE, a minor.  JANE DOE is a resident of the state of Illinois.

4.　　JOHN DOE, a minor, is an individual with disabilities including Autism Spectrum Disorder Level 1, Attention Deficit Hyperactivity Disorder, social anxiety, and learning disabilities. These disabilities substantially limit one or more of JOHN DOE's major life activities. At all relevant times, JOHN DOE had an Individualized Education Plan ("IEP") in place with Buffalo Grove High School, which *inter alia* identified his diagnoses.

5.　　District 214 is a governmental entity agency, specifically a local education agency, which serves residents in the communities of Arlington Heights, Buffalo Grove, Elk Grove, Mt. Prospect, Prospect Heights, Rolling Meadows, Wheeling and Des Plaines, Illinois. District 214 receives federal financial assistance. District 214 is a public entity under the ADA. 42 U.S.C. § 12131(1). Buffalo Grove High School is a District 214 school.

6.　　At all times relevant, Kevin Schrammel was employed as a Dean of Students at Buffalo Grove High School. Prior to becoming a Dean, Defendant Schrammel was a special education teacher for ten years.

**FACTUAL BACKGROUND**

7.　　JOHN DOE began attending Buffalo Grove High School ("BGHS") as a freshman in the Fall of 2016. Since his enrollment, JOHN DOE has had an IEP which identifies his disabilities and the accommodations he is allowed by law. At all times, District 214 has had possession of the IEP. Defendant knew JOHN DOE was a student with disabilities.

2

8.     According to the Diagnostic and Statistical Manual, Fifth Addition (DSM-V), published by the American Psychiatric Association and used as a diagnostic tool by physicians and mental health professionals, Autistic Spectrum Disorder is characterized by two primary areas of dysfunction: social communication and interaction.

9.     During JOHN DOE's attendance at BGHS, he was "mainstreamed," or placed into general education classes.

10.     Because he is autistic and has social anxiety, JOHN DOE had difficulty making friends and was often withdrawn and reserved at school, including sitting by himself before school, sitting alone in a quiet hallway to eat lunch instead of the noisy cafeteria, and walking quickly in the hallways to get to his classes.

11.     Because of his autism, JOHN DOE was targeted by Dean Kevin Schrammel. During the first weeks of school, Dean Schrammel contacted JANE DOE on a weekly basis to tell her that JOHN DOE displayed unusual behavior and that he was not acting like other kids at BGHS, such as sitting by himself at football games, before school and at lunch. During each conversation, JANE DOE reminded Dean Schrammel that JOHN DOE is autistic, and Dean Schrammel responded that he held a degree in special education.  Dean Schrammel told JANE DOE that JOHN DOE was forbidden from arriving to school early, even though other non-disabled students were allowed to do so. On numerous occasions, Dean Schrammel summonsed JOHN DOE to his office to advise JOHN DOE that his behavior, such as sitting by himself at lunch or walking down the hall quickly, was inappropriate and to discipline him. As a result, JOHN DOE was often forced to miss multiple classes.

12. On or about September 29, 2016, when JOHN DOE was a 15-year-old freshman, he was specifically sought out and removed from his physical education class by Dean Schrammel, a security officer, and Buffalo Grove Police Officer Baker. They escorted JOHN DOE to the Dean's office. Dean Schrammel, a security officer, and Officer Baker, who was armed, detained JOHN DOE for several hours and questioned without advising JOHN DOE of the reason. Being pulled out of class and questioned by the Dean with an armed police officer present caused JOHN DOE severe emotional distress, fear and anxiety that he was going to be arrested. Then, Dean Schrammel and Officer Baker conducted a search of JOHN DOE's locker during a passing period, such that the student body witnessed JOHN DOE being subject to this incriminating conduct. JOHN DOE's parents were not called before or while he was being questioned or during the search. Later that day, Dean Schrammel telephoned JANE DOE and informed her that several students reported there was a threat of a school shooting and they suspected "the weird kid who walks around" school. The students did not identify a "kid" by name, nonetheless Dean Schrammel focused on JOHN DOE. Several months later, it became widely known in the school and published on social media that Dean Schrammel questioned JOHN DOE regarding a rumored threat of a potential school shooting. JANE DOE subsequently requested that a statement be issued exonerating JOHN DOE of any wrongdoing, but Defendant refused.

13. Thereafter, JOHN DOE was subjected to alienation and bullying by peers due to the aforementioned conduct of Dean Schrammel. Defendant was aware of this peer bullying. In fact, on or about November 11, 2016, one female student engaged in bullying and repeatedly taunted JOHN DOE by calling him "a school shooter." The girl tricked JOHN DOE into a meeting after school and orchestrated a group to confront JOHN DOE and taunt him. A scuffle ensued. After investigating the incident, District 214 removed the girl from BGHS. Nonetheless, Defendant

did nothing to exonerate JOHN DOE or to otherwise cure the perception it created that he was a potential school shooter. In the Spring of 2017, Principal Wardel and Dean Schrammel specifically told JANE DOE that they would not apologize for accusing JOHN DOE of being a possible school shooter.

14.     In May 2017, in an attempt to gain approval of his peers, JOHN DOE headed a class for several days as if he was the teacher, when the regular teacher was absent. During those class periods, a substitute teacher sat in the classroom and did nothing. During those class periods, several teachers walked into the room, saw JOHN DOE heading the class and did nothing. Also, during one of the class periods, a panic alarm was pulled for the class room, and a security guard, a police officer, and a nurse came into the room and spoke with the substitute teacher. They ignored JOHN DOE who was sitting at the teacher's desk at the front of the class. When the regular teacher returned, JOHN DOE admitted to her what he had done. Thereafter, a security officer escorted JOHN DOE to Dean Kolodziej's office. In the office, JOHN DOE was confronted by Dean Kolodziej, a speech pathologist—with whom JOHN DOE did not have any contact—and a police officer. After JOHN DOE admitted that he pretended to be a teacher, Dean Kolodziej yelled at JOHN DOE which, coupled with the presence of a police officer, caused JOHN DOE increased anxiety. JOHN DOE's anxiety and frustration from the treatment he had consistently received at the hands of the BGHS' administration manifested as yelling back to the Dean. JOHN DOE then asked to go to his locker to retrieve his sweatshirt; however, the Dean and the police officer went to his locker and searched his locker and backpack. They confiscated a notebook which contained information JOHN DOE used for a "shout outs" list for his media class and which contained JOHN DOE's lists, which helped him cope with his symptoms of autism and anxiety. The Dean contacted JANE DOE and told her to have JOHN DOE professionally evaluated for safety concerns. JANE

5

DOE took JOHN DOE to a hospital for evaluation, and she was told that JOHN DOE was of no danger to himself or others.

15.     Based on his severe fear of being called to the office, having his locker unnecessarily searched, and being disciplined, JOHN DOE become increasingly anxious and introverted. He avoided using his locker or a backpack. His social isolation increased.

16.     On another occasion, JOHN DOE and several other students were debating politics and the issue of gun control. Later, JOHN DOE—and not the students without disabilities—was pulled out of class by a security officer and escorted to Dean Schrammel's office for questioning. Again, JANE DOE was called, and JOHN DOE was punished.

17.     In March of 2018, JOHN DOE was sitting with peers at a lunch table. The other students, who are not autistic, were discussing gun control. JOHN DOE did not participate in the conversation. The following day, only JOHN DOE was summonsed to Dean Schrammel's office and accused of making "threatening" statements during the gun control discussion. JOHN DOE became very frustrated and advised Dean Schrammel that he did not participate in the conversation. Nonetheless, Dean Schrammel gave JOHN DOE a one day in-school and a two day out-of-school suspension.

18.     JANE DOE made a request to the BGHS' social worker, Mr. Linheart, that she be called any time that JOHN DOE was to meet with Dean Schrammel. This did not occur.

19.     During JOHN DOE's time at BGHS, JANE DOE made repeated requests to Dean Schrammel that she be contacted prior to any surprise "lock down" drills so that she could prepare JOHN DOE to assuage his anxiety. Dean Schrammel refused until JOHN DOE threatened to bring an attorney.

6

20.     Because of the numerous times JOHN DOE was called to Dean Schrammel's office and forced to miss class time, JOHN DOE fell behind in most of his classes. Most of his teachers did not offer JOHN DOE any assistance to make up the work; instead, they insisted he advocate for himself which was clearly identified in his IEP as a skill he was unable to do. JOHN DOE failed most of his freshman year classes and continued to do poorly in his sophomore year.

21.     To date, the Defendant has never issued a statement exonerating JOHN DOE. The stigma of being questioned relative to a purported concern of a potential school shooting has continued to follow JOHN DOE. In fact, recently, JOHN DOE entered a local establishment to apply for a job and several employees recognized him as "the school shooter." JOHN DOE was so upset, he immediately left and would not apply for a position there.

22.     According to the United States Department of Education Civil Rights Data Collection, the Discipline Reports for Buffalo Grove High School demonstrate the following:

- In survey year 2015, BGHS reported enrollment of students with disabilities (per IDEA) of 8.7%. The percentage of students with disabilities receiving in-school suspensions was 20.5% and those receiving out-of-school suspensions was 22.2%.[1]

- In survey year 2013-2014, BGHS reported enrollment of students with disabilities (per IDEA) of 9.1%. The percentage of students with disabilities receiving in-school suspensions was 39.6% and those receiving out-of-school suspensions was 21.1%.[2]

- In survey year 2011-2012, BGHS reported enrollment of students with disabilities (per IDEA) of 13.1%. The percentage of students with disabilities receiving in-school suspensions was 30.9% and those receiving out-of-school suspensions was 28.4%.[3]

---

[1] https://ocrdata.ed.gov/Page?t=s&eid=278294&syk=8&pid=2538&sr=1&Report=6
[2] https://ocrdata.ed.gov/Page?t=s&eid=278294&syk=7&pid=2268&sr=1&Report=6
[3] https://ocrdata.ed.gov/Page?t=s&eid=278294&syk=6&pid=2000&sr=1&Report=6

23. Notwithstanding District 214's obligations under the Rehabilitation Act, the Defendant engaged in a practice of targeting students with disabilities, such as JOHN DOE, for harassment, unwanted negative attention and discipline. District 214 failed to provide JOHN DOE, a person with disabilities, the same access, use and enjoyment of education as other students, because of JOHN DOE's disabilities. This unequal treatment occurred because, among other things, Defendant targeted JOHN DOE for harassment, unwanted attention, and discipline based on his disabilities and failed to protect JOHN DOE from harassment, discrimination and a hostile environment.

## COUNT I

### JANE DOE as legal guardian of JOHN DOE - Violation
### of the Rehabilitation Act, 29 U.S.C. § 794a

1-23. Plaintiff incorporates by reference paragraphs 1 through 23 as if fully set forth herein.

24. At all times relevant, there was in full force and effect a statute known as the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et sequitur*, and its implementing regulations, 49 C.F.R. § 27.7. Congress enacted the Rehabilitation Act forty-six years ago as a comprehensive federal program to "empower individuals with disabilities to maximize . . . independence, and inclusion and integration into society, through . . . the guarantee of equal opportunity." 29 U.S.C. § 701(b)(1)(F).[4] To effectuate these purposes, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of

---

[4] Congress found that "disability is a natural part of the human experience and in no way diminishes the right of individuals to . . . contribute to society; pursue meaningful careers; and enjoy full inclusion and integration in the . . . economic . . . and educational mainstream of American society." 29 U.S.C. § 701(a)(3). Nonetheless, Congress found that "individuals with disabilities continually encounter various forms of discrimination in such critical areas as . . . education." 29 U.S.C. § 701(a)(5).

her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

Section 504 seeks "not only to curb 'conduct fueled by discriminatory animus,' but also to right 'the result of apathetic attitudes rather than affirmative animus.'" *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1152 (10th Cir. 1999) (quoting *Alexander v. Choate*, 469 U.S. 287, 296 (1985)); *see also* 28 C.F.R. § 41.51(b)(3) (Justice Department's Section 504 coordination regulation prohibiting criteria or methods of administration that have the purpose *or effect* of discriminating). Section 504's implementing regulations provide in pertinent part as follows:

A. An individual with a disability is "otherwise qualified" to participate in covered programs and activities if that individual "meets the essential eligibility requirements for the receipt of such services." 49 C.F.R. § 27.5.

B. "A recipient, in providing any aid, benefit or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability: (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or service; …(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefits, … as persons who are not handicapped; … (vii) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving an aid, benefit or service. 49 C.F.R. § 27.7(b).

25. Under Section 504 of the Rehabilitation Act, disability harassment is any intimidation or abusive behavior toward a student based on a disability that creates a hostile environment by interfering with the student's participation in benefit, services or opportunities in the institutions programs (U. S. Department of Education policy guidance, 2000 and 2010). A school must take immediate and appropriate action to investigate or otherwise determine what occurred upon knowing of the harassment. The obligation is triggered when a responsible

employee either knew or in the exercise of reasonable care should have known about the harassment.

26.     At all relevant times herein, Defendant knew JOHN DOE had federally protected rights to be protected from harassment and intimidation based on his disability, and Defendant's acts and omissions alleged herein violated and continue to violate the Rehabilitation Act and its implementing regulations in one or more or the following manners:

A.     Defendant has, by reason of disability, discriminated against JOHN DOE by targeting him for detainment and questioning, many times in the presence of an armed officer, while not questioning other students without disabilities who were involved, in violation of Section 504's broad nondiscrimination mandates, 29 U.S.C. § 794(a).

B.     Defendant has, by reason of disability, discriminated against JOHN DOE by targeting him for detainment and questioning for purported behavior which is consistent with his disability and not otherwise the basis for discipline, in violation of Section 504's broad nondiscrimination mandates, 29 U.S.C. § 794(a).

C.     Defendant has, by reason of disability, discriminated against the JOHN DOE by allowing him to be subjected to harassment, intimidation, and abusive behavior by administration, in violation of Section 504's broad nondiscrimination mandates, 29 U.S.C. § 794(a).

D.     Consistent with its practice of disproportionately disciplining students with disabilities, Defendant has, by reason of disability, discriminated against the JOHN DOE by imposing discipline on him while failing to discipline other students without disabilities engaging in the same behavior and by imposing disciplinary measures not reasonably related to the alleged offense.

E.     Defendant acted intentionally and with deliberate indifference and knew or should have known that it had not provided the benefit of its services to JOHN DOE.

27.     Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the

Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

28.     Defendant's conduct has inflicted injury and damages upon the JOHN DOE, including loss of civil rights, mental anguish, humiliation and mental pain and suffering.

29.     Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

WHEREFORE, Plaintiff prays for the following relief:

A.     An award of compensatory monetary damages;

B.     An award of attorneys' fees and costs; and

C.     Such other relief as the Court deems just.

## COUNT II

### JANE DOE as legal guardian of JOHN DOE – Intentional Infliction of Emotional Distress

1-23.     Plaintiff incorporates by reference paragraphs 1 through 23 above, as if fully set forth herein.

24.     Defendant's employee, Dean Schrammel, knew that JOHN DOE is autistic, which caused him to be withdrawn and reserved at school. Nonetheless, Dean Schrammel targeted JOHN DOE for what he labeled as "unusual behavior." Dean Schrammel repeatedly used security guards and armed police officers to remove JOHN DOE from classes in front of other students and escort JOHN DOE to the Dean's office. Further, he repeatedly detained JOHN DOE in his office for extended periods of time, on occasion for several hours with an armed police officer, with no stated

reason or because of purported "unusual behavior." Because JOHN DOE is autistic, Dean Schrammel pulled JOHN DOE out of classes and had his locker searched at times when other students were present, which further created a hostile environment for JOHN DOE. Dean Schrammel singled out JOHN DOE for discipline while other involved students, who do not have disabilities, were not.

25.     Dean Schrammel, a former special education teacher, was aware that his aforementioned actions had a high probability of causing emotional distress in an Autistic student like JOHN DOE. The outrageous conduct by Dean Schrammel was either intended to cause or was reckless or in conscious disregard of the high probability of causing JOHN DOE severe emotional distress.

26.     As a direct result of Dean Schrammel's conduct, JOHN DOE suffered fear of being arrested, humiliation, severe emotional anguish, anxiety, and distress, and was subjected to scorn, bullying, and ridicule. He required additional therapy for the severe emotional distress and anxiety resulting from this conduct.

27.     The conduct of Dean Schrammel was committed against JOHN DOE intentionally, maliciously, wantonly and willfully.

WHEREFORE, Plaintiff prays for the following relief:

A.     An award of compensatory monetary damages; and

B.     Such other relief as the Court deems just.

## COUNT III

**JANE DOE - Violation of the Rehabilitation Act, 29 U.S.C. § 794a**

1-23.    Plaintiff incorporates by reference paragraphs 1 through 23 as if fully set forth herein.

24.    Plaintiff's claims in Count III arise under the Rehabilitation Act, 29 U.S.C. § 701 *et sequitur*, Public Law 93-112, 87 Stat. 355, as amended, and its implementing regulations, 45 C.F.R. § 84.4(a), which provide in pertinent part that "[A]ny person aggrieved by any act or failure to act by any recipient of Federal assistance" under the Rehabilitation Act may bring suit. 29 U.S.C. § 794a(a)(2). This includes the non-disabled. In fact, "the use of such broad language in the enforcement provisions of the Rehabilitation Act evinces a congressional intention to define standing to bring a private action under the Rehabilitation Act  . . . as broadly as is permitted by Article III of the Constitution." *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 47 (internal quotation marks omitted). The standing provision of the Rehabilitation Act, § 794a(a)(2), is distinct from the provision prohibiting discriminatory conduct on the part of the recipient of federal assistance, § 794(a). Therefore, the type of injury a "person aggrieved" suffers need not be "exclu[sion] from the participation in, ... deni[al of] the benefits of, or ... subject[ion] to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a)

25.    Defendant receives federal financial assistance and is therefore subject to the anti-discrimination provisions of the Rehabilitation Act, as herein described.

26.     The bullying JOHN DOE. received at the hands of the administration or due to the actions of the administration caused JANE DOE, due to her association with a son with disabilities, tremendous stress, frustration, and mental anguish.

27.     JOHN DOE's resultant increased depression, anxiety, and isolation due to the Defendant's discriminatory treatment caused JANE DOE tremendous stress, frustration, and mental anguish.

28.     The repeated telephone calls from Dean Schrammel to JANE DOE for alleged disciplinary concerns caused JANE DOE tremendous stress, frustration, and mental anguish. Additionally, the repeated telephone calls and her trips to school when summonsed by Dean Schrammel interfered with and had a detrimental effect on JANE DOE's employment.

29.     At all relevant times herein, Defendant knew that Plaintiff had a federally protected right to not be treated in a discriminatory manner based on her association with her son. As such, Defendant's acts and omissions alleged herein violated the Rehabilitation Act and its implementing regulations in one or more or all of the following manners as Defendant has discriminated against Plaintiff by:

A.     Denying her the opportunity for the full and equal enjoyment of Defendant's goods, services, facilities, privileges, advantages, or accommodations.

B.     Denying her the opportunity to participate in or benefit from Defendant's goods, services, facilities, privileges, advantages, or accommodations.

C.     Offering or affording her services that are not equal to those services afforded to other parents or legal guardians whose children do not have disabilities.

D.     Failing to make reasonable modifications in policies, practices, or procedures, which are necessary to afford Defendant's goods, services and facilities to Plaintiff where such modifications would not fundamentally alter the nature of its goods, services or facilities.

14

E.     Acting intentionally and with deliberate indifference in repeatedly requiring Plaintiff to respond to purported disciplinary infractions which were in fact based on her son's disability; in questioning her son who has autism and anxiety disorder, based on her son's disability, in the presence of police without her knowledge or consent; in questioning or conducting disciplinary actions based on her son's disability without her knowledge or consent.

F.     Otherwise having discriminated against Plaintiff because of her relationship with a person with a disability.

30.     As a direct and proximate result of the foregoing, Plaintiff suffered the loss of a civil right and suffered great mental anguish, heightened stress, emotional distress and she was otherwise injured and damaged.

31.     Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d), *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

32.     Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

WHEREFORE, Plaintiff prays for the following relief:

A.     An award of compensatory monetary damages;

B.     An award of attorneys' fees and costs; and

C.     Such other relief as the Court deems just.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Dated:  May 6, 2019                    JANE DOE individually, and as the Legal Guardian of JOHN
                                       DOE, a Minor, Plaintiff.

                                            /s/ Jennifer M. Sender
                                           One of Her Attorneys

Jennifer M. Sender (ARDC No. 6207774)
Andrés J. Gallegos (ARDC No. 6212168)
Attorneys for Plaintiff
Robbins, Salomon & Patt, Ltd.
180 N. LaSalle Street, Suite 3300
Chicago, Illinois 60601
(312) 782-9000 - Telephone
(312) 782-6690 - Facsimile
jsender@rsplaw.com
agallegos@rsplaw.com