IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANE DOE, individually and as the legal guardian of JOHN DOE, a Minor, | )<br>)<br>) |
| Plaintiff, | ) Case No. 19-cv-3052<br>)<br>) Judge Robert M. Dow, Jr. |
| v. | )<br>) |
| TOWNSHIP HIGH SCHOOL DISTRICT 214, | )<br>)<br>) |
| Defendant. | )<br>) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs John Doe and Jane Doe ("Jane" and "John" respectively) bring suit, using fictitious names, against Defendant Township High School District 214 ("Defendant") for alleged violations of the Rehabilitation Act and state-law torts. Currently before the Court is Defendant's motions to dismiss pursuant to Rule 12(b)(6) and to strike pursuant to Rule 12(f) of the Federal Rules of Federal Procedure [14]. For the reasons set forth below, Defendant's motion to dismiss [14] is granted in part and denied in part, and Defendant's motion to strike [14] is denied. This case is set for status hearing on March 24, 2020 at 9:00 a.m. Counsel are directed to file a joint status report, including a proposed discovery plan, no later than March 20. 2020.

**I.     Background[1]**

Jane and John Doe are mother and son. [1, ¶ 3.] John, a minor, has been diagnosed with the following disabilities: Autism Spectrum Disorder Level 1, Attention Deficit Hyperactivity Disorder, social anxiety, and learning disabilities. [*Id.* at 4.] Two of the primary areas of

---

[1] For purposes of the motion to dismiss, the Court accepts as true all of Plaintiffs' well-pleaded factual allegations and draws all reasonable inferences in Plaintiffs' favor. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

dysfunction associated with autism are social communication and interaction. [*Id.*, ¶ 8.] John was a student at Buffalo Grove High School (BGHS), where he had an "Individualized Education Plan" in place that identified each of these diagnoses. [*Id.*] Kevin Schrammel ("Schrammel") was the Dean of Students at BGHS; Schrammel had at least a decade of experience in special education before being promoted to that position. [*Id.*, ¶ 6.]

John began his freshman year at BGHS in 2016. [*Id.*, ¶ 7.] John was "mainstreamed" into general education classes. [*Id.*, ¶ 9.] Due to his disabilities, John had a hard time making friends, and often sat and ate alone during free periods and walked quickly in the halls. [*Id.*, ¶ 10] Schrammel noticed John's withdrawn and reserved behavior, and regularly called Jane to report John's behavior. [*Id.*, ¶ 11.] Jane reminded Schrammel that John is autistic, but Schrammel brushed off Jane's explanation by noting that he had experience in special education. [*Id.*] Schrammel repeatedly called John into the office to discipline him for sitting alone and walking quickly, causing John to miss several classes. [*Id.*] Schrammel also forbade John from arriving to school early, although non-disabled students could do so. [*Id.*]

Early in his freshman year, John was pulled out of a physical education class by Schrammel and an armed Buffalo Grove police officer. [*Id.*, ¶ 12.] Schrammel and the officer interrogated John for hours; John's distress and anxiety were compounded by the fact that neither of the adults in the room explained why he was being questioned. [*Id.*] Schrammel and the officer then publicly searched Plaintiff's locker. [*Id.*] It turns out that the students at BGHS had heard wind (started a rumor?) of a threatened school shooting and suspected "the weird kid who walks around." [*Id.*] Schrammel, it appears, had picked up this thread and focused on John. Later, the students of BGHS found out that John had been questioned and spread rumors about John on social media. The school did nothing to combat the misconception that John was a security risk. [*Id.*] The students then

2

alienated and bullied John. [*Id.*, ¶ 13.] One student lured John to an after-school meeting, where she had orchestrated a mass confrontation and denunciation, at which there was some form of physical altercation. [*Id.*, ¶ 13.] Although the girl was apparently expelled from BGHS, the school still refused to apologize or admit wrongdoing. [*Id.*]

Things only got worse for John in May 2017, when one of his teachers was absent for several days. [*Id.*, ¶ 14.] In a misguided attempt to gain his peers' approval, John took over teaching the class from the substitute teacher, who inexplicably sat in the classroom and did nothing. [*Id.*] During one of those class sessions, someone pulled a panic alarm, drawing a security guard, police officer, and nurse into the room to talk to the substitute. [*Id.*] When the regular teacher returned, John admitted to having commandeered the class, and was escorted out of the classroom by a security officer. [*Id.*] John was taken to a speech pathologist's (Dean Kolodziej's) office, where Kolodziej and a police officer confronted and yelled at John. [*Id.*] John yelled back. [*Id.*] John asked to get a sweatshirt from his locker, but Kolodziej and the officer then searched his locker and backpack, where they found a notebook which contained a "shout out" list that John had prepared for his media class, and other various lists.[2] [*Id.*] Kolodziej called Jane and told her to have John professionally evaluated. The evaluation indicated that John was of no danger to himself or others. [*Id.*] John developed a fear of being called into the office or being searched; he stopped using his locker or backpack and became even more introverted and isolated. [*Id.*, ¶ 15.]

At some point, John and several other students were debating politics (including gun control). When the administration found out, a security officer hauled John out of class and took him to Schrammel's office, where John was punished. [*Id.*, ¶ 16.] In March 2018, John was present while other students discussed gun control. [*Id.*, ¶ 17.] Although John did not participate in the

---

[2] According to the complaint, creating lists helps John cope with the symptoms of his autism and anxiety. [*Id.*]

3

conversation at all, he was again called into Schrammel's office, where he was accused of making threatening statements about guns. [*Id.*, ¶ 17.] Notwithstanding John's protestations, Schrammel gave Doe a three-day suspension (which included a two-day out-of-school suspension). [*Id.*] Plaintiffs cite a bevy of statistics that show that BGHS students with disabilities have high suspension rates. [*Id.*, ¶ 22.]

Jane made several requests of the BGHS staff that went unheeded. First, she asked that they contact her any time that John was taken to Schrammel's office. [*Id.*, ¶18.] Next, Jane requested that she be given advance notice of "lock down" drills, so that she could emotionally prepare John. [*Id.*, ¶ 19.] Although Schrammel eventually relented on this latter point, it was only after Jane threatened litigation. [*Id.*]

As a result of repeatedly being called into the deans' suite, John missed class, fell behind in his coursework, and ultimately failed most of his freshman year classes (and continued to perform poorly in sophomore year). [*Id.*, ¶ 20.] These difficulties were compounded by the fact that John received no assistance making up missed work, notwithstanding his documented disabilities and difficulties advocating for himself. [*Id.*] To add insult to injury, the stigma of having been suspected of plotting a mass-murder has followed John around, especially given that Defendant has not cleared up this misconception. [*Id.*, ¶ 21.]

Plaintiffs summarize their allegations regarding John's treatment as follows:

Notwithstanding District 214's obligations under the Rehabilitation Act, the Defendant engaged in a practice of targeting students with disabilities, such as JOHN DOE, for harassment, unwanted negative attention and discipline. District 214 failed to provide JOHN DOE, a person with disabilities, the same access, use and enjoyment of education as other students, because of JOHN DOE's disabilities. This unequal treatment occurred because, among other things, Defendant targeted JOHN DOE for harassment, unwanted attention, and discipline based on his disabilities and failed to protect JOHN DOE from harassment, discrimination and a hostile environment. [*Id.*, ¶ 23.]

4

Plaintiffs filed suit, under fictitious names, alleging three counts: (1) violation of the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, against John; (2) intentional infliction of emotional distress against John; and (3) a violation of the Rehabilitation Act against Jane. Before the Court are Defendant's motion to dismiss the complaint pursuant to Rule 12(b)(6) and motion to strike Plaintiffs' fictitious names pursuant to Rule 12(f).

## II. Legal Standard

"In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must 'state a claim to relief that is plausible on its face.'" See, *e.g.*, *Lodholtz v. York Risk Serv. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's complaint needs not include "detailed factual allegations," but it must contain more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Thus, the complaint must include sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this stage, the Court "accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016)).

## III. Analysis

### A. Motion to Dismiss

#### 1. John's Rehabilitation Act Claim

Defendant does not move to dismiss the claim on the grounds that John has failed to plead the elements of a discrimination claim under the Rehabilitation Act. Rather, it argues that John

failed to exhaust certain administration procedures. Plaintiffs counter that they did not need to exhaust those procedures, because the statute requiring exhaustion was not in play here.

John's Rehabilitation Act claim implicates (as is relevant here) two federal laws that regulate the treatment of students with disabilities: the Rehabilitation Act and the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*. Briefly, "IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities. As defined in the Act, a FAPE comprises 'special education and related services'—both 'instruction' tailored to meet a child's 'unique needs' and sufficient 'supportive services' to permit the child to benefit from that instruction." *Fry v. Napoleon Community Schools*, 137 S.Ct. 743, 748–49 (2017) (internal citations omitted). The "primary vehicle for providing each child with the promised FAPE" is an "individualized education program" ("IEP"), which "spells out a personalized plan to meet all of the child's educational needs." *Id.* at 749 (citations and quotation marks omitted). Parents may bring lawsuits against schools in federal court regarding the denial of a FAPE, but they must first exhaust their administrative remedies. *Id.*; see also § 1415(i)(2)(A). The IDEA now includes the following provision:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

§ 1415(*l*). In contrast, the Rehabilitation Act, under which John is nominally suing, does not have an exhaustion requirement. Section 504 of the Rehabilitation Act, codified at 29 U.S.C. § 794, simply prohibits any "federally funded 'program or activity'" from "discriminating based on disability." *Fry*, 137 S. Ct. at 749 (quoting 29 U.S.C. § 794(a)).

6

In *Fry v. Napoleon Community Schools*, the Supreme Court examined the interaction between these two statutes and the IDEA's exhaustion provision, which requires that plaintiffs "seeking relief that is also available under [the IDEA]" must first exhaust the IDEA's procedures. These questions arise because intentional discrimination in an educational environment may interfere with a student's FAPE, and the failure to provide a FAPE could be reframed as intentional discrimination. *Id.* at 755. The Supreme Court held that parents are not always required to exhaust the IDEA's procedural requirements. *Fry*, 137 S. Ct. at 752. Rather, a plaintiff is required to exhaust these procedures "when (but only when) her suit 'seek[s] relief that is also available under the IDEA," that is, "the denial of a FAPE." *Id.*

In determining whether a plaintiff seeks relief for the denial of a FAPE, a court must look to the "substance of, rather than the labels used in, the plaintiff's complaint. * * * What matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading." *Id.* at 755. In determining whether the complaint "seeks relief for the denial of an appropriate education," the court "should consider substance, not surface. The use (or non-use) of particular labels and terms is not what matters. The inquiry, for example, does not ride on whether a complaint includes (or, alternatively omits) the precise words(s) 'FAPE' or 'IEP.'" *Id.* To aid courts in this substantive inquiry, the Supreme Court suggested

> asking a pair of hypothetical questions. First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance? When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim.

7

*Id.* at 756. The Supreme Court also suggested examining the history of the litigation: whether a plaintiff initially sought relief through the IDEA procedures before switching midstream to litigation may be probative as to whether this is truly a FAPE claim. *Id.* at 757.

Although the Seventh Circuit has not yet weighed in on how to apply these tests in practice, several other circuits have. Some examine the precipitating events giving rise to the lawsuit. *Wellman v. Butler Area School District*, 877 F.3d 125, 134 (3d Cir. 2017) (holding that plaintiffs must exhaust IDEA procedures because "his grievances all stem from the alleged failure to accommodate his condition and fulfill his educational needs"); *McMillen v. New Caney Independent School District*, 939 F.3d 640, 645 (5th Cir. 2019) (explaining that the claim arose under the IDEA when the complaint's "allegations blame what happened to [plaintiff] on the district's failure to comply with the IDEA"). Invoking the existence and content of an IEP to provide "context that the school had notice regarding [plaintiff's] inability to protect herself" or establishing that discrimination resulted in "denial of an educational opportunity or benefit" does not convert a discrimination lawsuit into an IDEA action requiring exhaustion. *Doe v. Dallas Independent School District*, 941 F.3d 224, 227 (5th Cir. 2019); see also *J.S., III by and through J.S. Jr. v. Houston County Board of Education*, 877 F.3d 979, 986–87 (11th Cir. 2017) (per curium) (holding that exhaustion was not required when school removed student from class, in violation of IEP, because the circumstances "implicate [] further intangible consequences of discrimination * * * that could result from isolation, such as stigmatization * * *.")

Defendant highlights two statements in the complaint in support of its argument that John's claim is *really* about the denial of a FAPE. Paragraph 20 of the complaint [1] alleges that John "fell behind in most of his classes" "because of the numerous times [he] was called into Dean Schrammel's office and forced to miss class time." And Paragraph 23 explains that Defendant

8

failed to provide him with "the same access, use and enjoyment of education as other students because of [his] disabilities." The rest of the complaint, as recounted above, focuses on Plaintiff being pulled out of class, humiliated, subjected to searches, and punished for conduct that no other non-disabled student was singled out for—that is, discrimination. [1, ¶¶ 11, 12, 16–17, 22, 23.]

Notwithstanding the complaint's language regarding the educational limits Plaintiff ran up against, the crux of the complaint is directed toward discrimination that had nothing to do with a FAPE, and therefore this count may proceed. Preliminarily, the Supreme Court has cautioned against looking at the surface (as opposed to the substance) of a complaint, and therefore the complaint's allusions to John's educational opportunities cannot be dispositive. *Fry*, 137 S. Ct. at 755. Next, answers to both of *Fry*'s hypothetical questions indicate that the crux of this lawsuit is not a FAPE. First, John's claim that he was singled out for detention, interrogation, and searches, although hard to "divorce * * * from the context of him being a[] [] student at a school," *Houston County Board of Education*, 877 F.3d at 986, could present a cause of action in other contexts. Second, an adult, "such as an employee or a visitor" could press the same claims. Third, the case at bar is on all fours with at least two federal appellate decisions. *Houston County Board of Education*, 877 F.3d 979 (11th Cir. 2017) (per curium), explained that plaintiff's being "excluded and isolated from his classroom and peers on the basis of his disability," although also a violation of his IEP, was not, first and foremost, related to his FAPE. *Id.* at 987. Here, John's injuries from being pulled out and punished "reach beyond a misdiagnosis or failure to provide appropriate remedial coursework" and therefore do not implicate the IDEA. *Id.* at 987. And *Dallas Independent School District*, 941 F.3d 224 (5th Cir. 2019), explained that plaintiffs do not need to proceed under the IDEA in all suits that "implicate[] the denial of [their] educational opportunities." *Id.* at 229. Indeed, although that plaintiff filed a sexual harassment suit under a

"cause of action requir[ing] proving the denial of an educational benefit," the court concluded that the "claim regards 'simple discrimination, irrespective of the IDEA's FAPE obligation.'" *Id.* (quoting *Fry*, 137 S. Ct. at 756). So too here, where John explains that the discrimination had a particularly deleterious effect on his education. Working to get him back up to speed in his coursework, however, would have done nothing to address the actual problem—that he was the victim of (alleged) discrimination. Thus, relatedly, the causal chain goes in the opposite direction as it did in *Wellman* and *McMillen*: the underlying problem was discrimination, which caused further deterioration of John's educational opportunities. See *Wellman*, 877 F.3d at 134; *McMillen*, 939 F.3d at 645.

In sum, John alleges that he was harassed by school administrators and singled out for isolation, investigation, and punishment because of his disability. Although such treatment indirectly impeded his access to a FAPE, the "gravamen" of his complaint is for discrimination on the basis of disability, and he therefore may proceed notwithstanding his failure to avail himself of any administrative procedures as required by IDEA.[3]

### 2. Jane's Rehabilitation Act Claim

"It is widely accepted that under both the RA and the ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person." *McCullum v. Orlando Regional Healthcare System, Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014) (collecting cases from several circuits); see also *Hale v. Pace*, 2011 WL 1303369, at *5 (N.D. Ill. March 31, 2011) (allowing associational discrimination claim to proceed when the plaintiff was denied a service (bus access) because she was traveling with her disabled daughter). But the exact

---

[3] Because the Court retains federal question jurisdiction, it will not dismiss John's state-law tort claim, which derives from the same nucleus of operative fact—his alleged treatment at the hands of BGHS administrators. See 28 U.S.C. § 1367(a); *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 164–165 (1997) (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

circumstances under which non-disabled plaintiffs may bring such claims is not entirely clear. *McCullum*, 768 F.3d at 1142. The relevant part of the statute allows "*any* person aggrieved by any act or failure to act by any recipient of Federal assistance" to sue. 29 U.S.C. § 794a(a)(2) (emphasis added). Although the Seventh Circuit has not weighed in on how much emphasis to put on "any," other circuits have varied in how capacious this language really is. Compare, *e.g.*, *McCullum*, 768 F.3d at 1143 ("We reject the contention that non-disabled individuals may seek relief under the RA and ADA for injuries other than exclusion, denial of benefits, or discrimination that they themselves suffer. If that contention were correct, it would mean that Congress granted non-disabled persons more rights under the ADA and RA than it granted to disabled persons * * *."), with *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) ("[T]he use of such broad language in the enforcement provisions of the statutes evinces a congressional intention to define standing to bring a private action under 504 [and Title II] as broadly as is permitted by Article III of the Constitution.") (quotation marks and citation omitted). In other contexts where statutes use the same "aggrieved" language, however, the Supreme Court and Seventh Circuit have rejected the latter, maximalist view. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176–77 (2011); *Richards v. N.L.R.B.*, 702 F.3d 1010, 1014 (7th Cir. 2012) ("However, the Supreme Court recently held that a similar 'aggrieved' requirement in Title VII did not refer to 'anyone with Article III standing,' but referred more narrowly to people who 'fall[ ] within the zone of interests sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.'") (quoting *Thompson*, 562 U.S. at 178) (cleaned up); see also *Friends of Trumbull v. Chicago Board of Education*, 123 F. Supp. 3d 990, 996 (N.D. Ill. 2015) (arguing that cases extending statutory standing to its constitutional limits are no longer "good law").[4]

---

[4] Plaintiff's heavy reliance on the controversial decision in *Loeffler v. Staten Island University Hosp.*, 582 F.3d 268 (2d Cir. 2009), is therefore misplaced, as it, in turn, relied on the maximalist statutory standing

Courts in the Northern District of Illinois have held that "[a]n indirect injury is not enough" to state an associational claim under the Rehabilitation Act. *Hale*, 2011 WL 1303369, at *5 (quotation marks and citation omitted).[5] Rather, "the plaintiff bringing an associational discrimination claim [must] suffer some specific, separate, and direct injury as a result of his association with the disabled individual." *Micek v. City of Chicago*, 1999 WL 966970, at *3 (N.D. Ill. Oct. 4 1999) (denying family member's associational claim when the gist of it was that his insurance premiums went up because of his wife and son's respective disabilities). Thus, "non-disabled persons have standing to seek relief under [the Rehabilitation Act] only if they allege that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person." *McCullum*, 768 F.3d at 1143 (citing § 794(a)); see also *Hale*, 2011 WL 1303369, at *5 ("[Plaintiff] must have been discriminated against or singled out in a discriminatory way due to [her] association with disabled persons.") (quotation marks and citation omitted); *R.S. by R.D.S. v. Butler County, Pennsylvania*, 700 Fed. Appx. 105,

---

holding that the Supreme Court and Seventh Circuit have rejected in similar contexts where the same language was used. See *Friends of Trumbull*, 123 F. Supp. 3d at 996. Other courts have also distinguished *Loeffler* based on its "extreme facts." *McCullum*, 768 F.3d at 1144. In *Loeffler*, the non-disabled plaintiffs were two minor children who were forced by the defendant hospital to provide sign language interpretation for their deaf parents, one of whom was hospitalized, notwithstanding the fact that federal law expressly required that hospitals provide this service themselves. *Loeffler*, 582 F.3d at 280 (Wesley, J., concurring) (controlling op.). As a result of having to be "on-call via pager twenty-four hours a day[,] [] they missed school," and one of them "was forced to witness his father suffer a stroke and was then required to relay the doctor's assessment of his father's condition to his mother." *Id.* at 281. But here, Jane reports that she *specifically requested* to be called every time that John was disciplined. And, in any event, in answering the deans' calls, she was not "filling a gap" that the school was obligated to provide itself. Compare *McCullum*, 768 F.3d at 1145, with *Loeffler*, 582 F.3d at 280–81 (Wesley, J., concurring) (controlling op.); see also *Durand v. Fairview Health Services*, 902 F.3d 836, 844–45 (8th Cir. 2018) (distinguishing *Loeffler* on similar grounds—that these plaintiffs "were not denied statutorily required services" and thus could not rely on *Loeffler*).

[5] *Hale* also observed that courts analyze associational claims under the 12(b)(6) rubric, as an instance of statutory standing, or both at the same time—and that "the result would likely be the same under either framework." *Id.* at *4 n.3 (discussing *Micek v. City of Chicago*, 1999 WL 966970, at *3 n. 6 (N.D. Ill. Oct 4, 1999).

12

109 (3d Cir. 2017) (affirming dismissal when "[t]he complaint is devoid of factual allegations from which we may plausibly infer that the parents were personally excluded from participation in or denied the benefits of a covered activity or subjected to discrimination because of their son's disability."). Admittedly, the distinction between direct and indirect discrimination can be a fine one. Compare *Finch v. Housing Authority of Cook County*, 2019 WL 3766113, at *4 (N.D. Ill. Aug. 9, 2019) (plaintiff could hypothetically state an associational discrimination claim when her family was evicted because her children were disabled, but did not plead sufficient factual matter from which court could infer that defendants actually *discriminated* against plaintiff's family), with *Simenson v. Hoffman*, 1995 WL 631804, at *5 (N.D. Ill. 1995) (dismissing parents' associational lawsuit when they were ejected from hospital, along with disabled son, when hospital denied the son care).

Here, Jane has failed to state a claim for associational discrimination. She alleges that she (1) experienced "stress, frustration, and mental anguish" upon learning of John's mistreatment; (2) experienced "stress, frustration, and mental anguish" as a result of John's increasing depression, anxiety, and isolation; and (3) had to expend emotional energy and work time dealing with Schrammel's phone calls. The first two claims—which tertiarily connect John's harassment to his mental state, and then to Jane's emotional state—are not "specific, separate, and direct injur[ies]" and therefore cannot give rise to an associational claim. *Micek*, 1999 WL 966970, at *3.

The third theory also does not state a claim for associational discrimination. This case is quite similar to *Simenson v. Hoffman*, 1995 WL 631804 (N.D. Ill. 1995), in which a disabled child's parents were ejected from the hospital along with the child upon the child's being refused medical care. *Id.* at *6. The court reasoned that "the treatment of the child is at the center of the dispute" and the parents' claim was just an outgrowth of the denial of the son's medical care. *Id.*

13

In other words, although the parents were in fact ejected, and presumably had to deal with the logistical consequences of the ejection at their own expense, it was not a specific, separate, and direct injury. See *id.* at *5–6. So too here: according to the complaint, the phone calls were solely about the school's response to John's behavior—that is, "the treatment of the child is at the center of the dispute." *Simenson*, 1995 WL 631804, at *6. And Jane has not pointed to any facts from which the Court can plausibly infer that that she was *personally* discriminated against. See *Finch*, 2019 WL 3766113, at *5; see also *McCullum*, 768 F.3d at 1145 (affirming dismissal of complaint when "[t]here are not even any allegations that [the] hospitals excluded, denied benefits to, or discriminated against the parents or sister because of their association with [the disabled minor child]"); *Butler County*, 700 Fed. Appx. at 109–10. To the contrary, Jane pleads that she *requested* that she be called every time John dealt with the administration. Thus, the phone calls were not an unwanted exclusion, benefit denial, or act of discrimination against Jane, rather, they were a manifestation of John's mistreatment that did not specifically, separately, and directly harm Jane.

B. **Motion to Strike**

Defendant has also moved, pursuant to Rule 12(f) to strike Plaintiffs' respective fictitious names. Because "anonymous litigation runs contrary to the rights of the public to have open judicial proceedings," the Seventh Circuit has repeatedly frowned on the practice. *Doe v. Village of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). But a district court may still discretionarily allow parties to proceed under fictitious names. *K.F.P. v. Dane County*, 110 F.3d 516, 519 (7th Cir. 1997). "To proceed anonymously, a party must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Village of Deerfield*, 819 F.3d at 377. "[P]articularly vulnerable parties" such as "children [or] rape victims" may be better positioned to demonstrate

exceptional circumstances. *Id.* (quoting *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 872 (7th Cir. 1997)). Likewise, fear of "reprisals," particularly violent ones, can be an exceptional circumstance. *Doe ex rel. Doe v. Elmbrook School Dist.*, 658 F.3d 710, 723 (7th Cir. 2011) overruled on other grounds, 678 F.3d 840 (7th Cir. 2012) (en banc). On the other hand, run-of-the-mill harassment claims, or fear of the disclosure of embarrassing or private information do not present exceptional circumstances on their own. *Village of Deerfield*, 819 F.3d at 377 (collecting cases); see also, *e.g.*, *PTG Nevada, LLC v. Does 1–25*, 2016 WL 3521941, at *2 (denying anonymous *defendant*'s motion to proceed anonymously, notwithstanding defendant's having been accused of embarrassing and illegal conduct).

Here, Jane Doe is not a minor child, but she is litigating on behalf of her son, John Doe. John was not only a minor at the time of these incidents, but he has several documented disabilities that led to poor school performance, social isolation, and extreme anxiety. The circumstances that led to this litigation—John having been accused of being a school shooter—are also particularly sensitive and stigmatizing for a minor. There is, indeed, at least some suggestion that John has already been isolated, stigmatized, and subject to reprisals based on that accusation. [1, ¶¶ 12–13, 16–17, 21.]. On the other side of the ledger, John has since reached the age of majority, [1, ¶ 12], and notwithstanding his disabilities, has been "mainstreamed" into the student population. Though he got into a scuffle related to the school-shooter accusation, there is no indication that John has been subject to the serious and specific threats that convinced the court in *Elmbrook School Dist.* that anonymity was necessary.

After weighing the legal standard, public policy, and facts presented here, the Court concludes that the case at bar presents "exceptional circumstances" such that John and Jane may proceed anonymously. John, as a student with multiple diagnosed disabilities, is "particularly

15

vulnerable," especially in light of the continued isolation and ridicule he experienced in the events precipitating this litigation. Moreover, his particular medical condition renders him even more vulnerable to threats and isolation. [1, ¶ 10.] And if the alleged celerity with which rumors blaze through the BGHS community is accurate [see *id.*, ¶ 12]—which the Court must assume to be true for present purposes—then revealing Jane's name would effectively unmask John. Defendant's motion to strike is therefore denied at this time, but subject to reconsideration as the facts and circumstances of this case develop.

IV. **Conclusion**

For the reasons set forth above, Defendant's motion to dismiss [14] is granted in part and denied in part, and Defendant's motion to strike [14] is denied. This case is set for status hearing on March 24, 2020 at 9:00 a.m. Counsel are directed to file a joint status report, including a proposed discovery plan, no later than March 20. 2020.

Dated: March 6, 2020

_____
Robert M. Dow, Jr.
United States District Judge