UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Shaun Dolan, ) | |
| ) | |
| Plaintiff, ) | No. 1:19-CV-03052 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| Township High School District No. 214, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Shaun Dolan, when he was a high school student back in 2016, was questioned and disciplined by school administrators on different occasions. Dolan brought this lawsuit against the school district, alleging that the district discriminated against him based on his disability, in violation of Title II of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act. R. 1, Compl.; R. 100, Am. Compl.[1] Dolan also brought a claim under Illinois law for intentional infliction of emotional distress.[2] The school district now moves for summary judgment on all claims. R. 107, Def.'s Mot. For the reasons explained below, summary judgment on the federal ADA and Rehabilitation Act claims is granted, and the Court relinquishes jurisdiction over the remaining state law claim.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

[2]Because this action was brought under the ADA and the Rehabilitation Act, this Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367.

## I. Background

In 2016, Dolan was a freshman at Buffalo Grove High School, which is a part of Township High School District 214 (for convenience's sake, the District). Dolan—who has autism, attention deficit hyperactivity disorder, social anxiety, and learning disabilities—had an Individualized Education Program (commonly known as an IEP) in place while attending the school. R. 114, Pl.'s Resp. DSOF ¶¶ 1–2; R. 108-6, Exh. G (Kolodziej Dep.) at 49:22–50:1.

For the couple of years that Dolan attended Buffalo Grove High School, he was called into the dean's office and questioned on several occasions. In September 2016, there was a rumor going around the school that someone was going to commit a shooting at the Homecoming bonfire or pep rally. Pl.'s Resp. DSOF ¶ 4. The rumor was reported to the dean's office, and a student identified Dolan as the possible subject (that is, the supposed shooter) of that rumor. R. 108-2, Schrammel Dep. Tr. at 90:24–93:1, 94:15–95:21; R. 108-8, Exh. H; R. 108-10, Exh. J;[3] *see* Pl.'s Resp. DSOF ¶ 4. One of the deans, Dean Kevin Schrammel, had a security officer[4] pull Dolan out of gym

---

[3]In Dolan's response to the District's Statement of Facts, Dolan objects to DSOF Exhibit H (Dean Kevin Schrammel's notes), Exhibit I (school behavior reports), and Exhibit J (police report about the September 2016 incident) as inadmissible hearsay to the extent that they are offered for the truth that Dolan made certain inciting statements. *E.g.*, Pl.'s Resp. DSOF ¶¶ 45, 49, 50, 55. But these exhibits are not relied on for the truth that Dolan in fact made the inciting statements. Rather, the exhibits support that the school *received* student reports about Dolan, so the statements are offered for their impact on the *listener*—not for their substantive truth. Dolan does not dispute—and has presented no evidence to the contrary—that the students indeed made these reports about Dolan.

[4]These officers, called "student resource officers," were local police officers assigned to the school and had a variety of functions, including serving as a liaison between the school

2

class and bring Dolan to Schrammel's office. Pl.'s Resp. DSOF ¶ 6. Schrammel and the officer questioned Dolan, and Schrammel also looked through Dolan's backpack and school lockers to search for any weapons. Schrammel Dep. at 103:4–18, 106:11-109:10. No weapons were found, and Schrammel concluded that the rumor was not credible and that Dolan posed no threat. Schrammel determined that no further inquiry or discipline was necessary. Pl.'s Resp. DSOF ¶ 11; R. 108-10, Exh. J; *see* Schrammel Dep. at 110:21–113:19. Schrammel then notified Dolan's mother that Dolan had been questioned about the rumor, and Schrammel also followed up with the reporting students to let them know that the rumor was unsubstantiated. Schrammel Dep. at 111:22–113:19; *see* Pl.'s Resp. DSOF ¶¶ 12, 14.

Later that year, in November 2016, Dolan was involved in a physical altercation with other students. Pl.'s Resp. DSOF ¶¶ 15–16. During this incident, Dolan picked up a female student and attempted to put her into a garbage can. *See id.*; R. 108-1, Shaun Dolan Dep. at 56:12–57:4; *see also* R. 108-9, Behavior Report at 6. Schrammel spoke with Dolan about the incident and gave him a lunch detention. Behavioral Report at 6; *see* Pl.'s Resp. DSOF ¶¶ 18–19. A month later, in December 2016, Dolan was involved in another altercation with a different classmate, during which Dolan placed his hand on her neck. Pl.'s Resp. DSOF ¶¶ 21–23; R. 108-1, Shaun Dolan Dep. at 57:24–60:7. Dolan received a half-day of in-school suspension and one day of out-of-school suspension for this incident. *See* Pl.'s Resp. DSOF ¶ 26.

---

and the police department and doing trainings with students. R. 114-1, Wardle Dep. at 29:23–32:21.

3

Then, in May 2017, Dolan played a prank on a substitute teacher by pretending to be a teacher's assistant during two classes. Pl.'s Resp. DSOF ¶ 28. Dolan changed into different clothes to impersonate a teacher, introduced himself as a teacher's assistant to the substitute teacher, and gave out assignments to students. R. 108-1, Shaun Dolan Dep. at 61:21–75:13. The prank was reported to another dean at the school, Dean Kolodziej, and Dolan was brought to the dean's office and questioned about the prank. R. 108-6, Kolodziej Dep. at 104:16–24; 112:16–115:20. During this meeting, Dolan became upset and requested that he be able to go to his locker to get his sweatshirt. Pl.'s Resp. DSOF ¶ 34; Shaun Dolan Dep. at 82:14–23. Kolodziej denied Dolan's request but sent a security officer to bring Dolan's belongings from his locker. Pl.'s Resp. DSOF ¶¶ 34–35; Shaun Dolan Dep. at 82:14–83:10. Kolodziej searched Dolan's belongings and found a notebook containing a list of students' names and other information like students' arrival times to school.[5] Pl.'s Resp. DSOF ¶ 35; Shaun Dolan Dep. at 85:8–86:21, 94:23–95:3; Kolodziej Dep. at 118:4–120:13. The school called Dolan's mother and requested that she take Dolan for a health-and-safety evaluation, which she did. Pl.'s Resp. DSOF ¶ 37. The school did not take any disciplinary action against Dolan for this incident. Pl.'s Resp. DSOF ¶ 38.

Finally, in around February and March of 2018, on multiple occasions, several students reported to the dean's office that Dolan had made statements relating to guns or violence. R. 108-8, Exh. H; Schrammel Dep. at 195:19–196:22; *see* R. 114, Pl.'s

---

[5]According to Dolan, he journaled patterns and lists in his notebook as a way of coping with his anxiety. Pl.'s Resp. DSOF ¶ 35.

4

Resp. DSOF ¶¶ 45, 50, 56 (not disputing the fact that students made these reports). For instance, students reported that Dolan had made statements about the school shooting that had recently occurred in Parkland, Florida; about how he could make a bomb out of a cell phone or materials in the classroom; and that his senior quote for the yearbook would be "It was all planned." *See* R. 114, Pl.'s Resp. DSOF ¶¶ 45, 50, 56. After these reports, Dolan was called to the dean's office and questioned by Schrammel. *See* Pl.'s Resp. DSOF ¶¶ 46, 57. On some of these occasions, Dolan received no disciplinary consequences, but on one occasion Dolan received three days of suspension. *Id.* ¶¶ 49, 55, 60.

After this suspension, Dolan's mother requested that Dolan be transferred to a different school. Pl.'s Resp. DSOF ¶ 61. The District transferred Dolan to a private therapeutic day school, where he successfully completed high school. R. 108-3, Ex. C (Meyer Dep.) at 42:7–14; R. 108-11, Ex. K (Rachael Dolan Dep.) at 131:2–135:2; *see also* Pl.'s Resp. DSOF ¶¶ 63–64.

Dolan sued the District, bringing claims under Title II of the ADA, 42 U.S.C. §§ 12101 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.*; and Illinois common law for intentional infliction of emotional distress. R. 100, Am. Compl. The District now seeks summary judgment, arguing that the record does not show that the District discriminated against Dolan. R. 107; R. 109, Def.'s Br. at 2, 5.

## II. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, the Court must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

#### A. ADA and Rehabilitation Act Claims

The District moves for summary judgment on Dolan's ADA and Rehabilitation Act claims. The ADA and the Rehabilitation Act "prohibit discrimination against the disabled." *H.P. by & through W.P. v. Naperville Cmty. Unit Sch. Dist. #203*, 910 F.3d 957, 960 (7th Cir. 2018). Because the relevant provisions of the two statutes are "materially identical," and because neither party argues that there is a material

difference between the statutes, the Court applies the same analysis to both claims.[6] *A.H. ex rel. Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) (cleaned up). There are three different ways that a plaintiff can establish disability discrimination under the ADA and the Rehabilitation Act: by showing that "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *A.H.*, 881 F.3d at 593. Both the ADA and the Rehabilitation Act require proof of causation; because the statutes prohibit discrimination "on the basis of" or "by reason of" the disability, the plaintiff must show "that, 'but for' his disability, he would have been able to access the services or benefits desired." *H.P.*, 910 F.3d at 960–61 (cleaned up).

Dolan asserts that Schrammel intentionally discriminated against him by "singl[ing] Plaintiff out" and "repeatedly call[ing] Plaintiff to the [dean's] office for behavior related to his Autism and anxiety." R. 115, Pl.'s Resp. at 2, 9. However, although Dolan was indeed called to Schrammel's office on multiple occasions, the record—even when viewed in the light most favorable to Dolan—does not support that

---

[6]Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The District does not dispute that Dolan is a qualified individual with a disability.

7

Schrammel did so on the basis of Dolan's disability. For instance, as noted above, Schrammel did pull Dolan out of class to question him in September of 2016. Pl.'s Resp. DSOF ¶ 6. But this was to investigate a rumor circulating around the school that someone was planning to commit a shooting during the school's Homecoming bonfire or pep rally—and another student specifically named Dolan as the subject of the rumor. Schrammel Dep. at 91:14–92:16, 94:15–95:21; R. 108-8, Exh. H; R. 108-10, Exh. J. Dolan does not dispute the existence of the rumor or that his name was reported to the dean's office. *See* Pl.'s Resp. DSOF ¶¶ 4–5 (denying that Dolan made statements at school that suggested he was planning a shooting, but not disputing that a student identified and reported Dolan as the possible shooter). Schrammel testified that he called Dolan to his office because of student reports about the rumor and because Dolan was the student specifically named, and Dolan does not point to anything in the record that casts doubt on this testimony or Schrammel's motivation for questioning Dolan. Schrammel Dep. at 91:14–93:1, 94:15–95:21; *see* Pl.'s Resp. at 4–5. In other words, the record shows that Schrammel called Dolan into his office in response to student reports about the rumor and that Dolan was the subject of the rumor—not to single out Dolan because of his disability.

Similarly, in November and December of 2016, Dolan was questioned and disciplined for having physical altercations with other students (attempting to place a student in a garbage can and placing his hand on another student's neck). Pl.'s Resp. DSOF ¶¶ 15–23, 26; R. 108-1, Shaun Dolan Dep. at 56–60; R. 108-9, Exh. I at 6. And in May 2017, Kolodziej called Dolan into his office and questioned him after Dolan

8

played a prank on a substitute teacher by pretending to be a teacher's assistant. Dolan does not dispute that he indeed got into those physical altercations with classmates,[7] nor does he dispute that he played the prank. And there is no evidence suggesting that the deans' questioning and discipline was prompted by anything other than the altercations and the prank.[8] Thus, as with the other examples, the record does not show that Schrammel disciplined Dolan because of Dolan's disability.

Same for the incidents in February and March of 2018: Schrammel did question Dolan and suspended him for three days, but only after several students reported that Dolan made disturbing statements about guns and violence, including about how Dolan could make a bomb out of a cell phone or materials in the classroom; that his yearbook quote would be "It was all planned"; that the "Pics of guns on social media are mine"; and "If someone disrespects me, they will get clapped." *See* R. 114, Pl.'s

---

[7]Dolan points out that the other students involved in these altercations did not receive disciplinary consequences, even though they provoked the altercations. Pl.'s Resp. at 5. But, as Schrammel testified, Dolan was the one to receive lunch detention for the garbage-can incident because Dolan's conduct—trying to put a classmate in the garbage can—"was the most concerning behavior that was shown" during that incident. R. 108-2, Ex. B (Schrammel Dep.) at 135:19–136:3. And for the December 2016 incident, Dolan was the one to receive suspension because, even though the other student was antagonizing Dolan by calling him names, Dolan initiated the *physical* contact and placed his hand on a student's neck. Shaun Dolan Dep. at 57:24–59:13; *see* Pl.'s Resp. DSOF ¶¶ 22–23. Dolan has not presented any evidence to the contrary.

[8]As discussed above, when Dolan was questioned about the prank incident, he was also questioned about a black notebook in his locker that listed students' names and their arrival times to school, and the number of school security cameras and their blind spots. *See* Shaun Dolan Dep. at 85:8–87:1, 94:23–96:15. Dolan does not dispute that his locker was searched during this meeting only after Dolan, in a heightened emotional state, asked to retrieve something from his locker, and that Dolan received no disciplinary consequences for the prank or the notebook. R. 114, PSOF ¶¶ 24–25; Pl.'s Resp. DSOF ¶ 38; Shaun Dolan Dep. at 82:14–83:15.

Resp. DSOF ¶¶ 45, 50, 56. Although Dolan "denies he made these comments or that he would have done so given the heightened emotional state due to" recent events (the school shooting in Parkland, Florida), Dolan does not deny that students indeed reported these statements to the school. Pl.'s Resp. at 6–7; *see* R. 114, Pl.'s Resp. DSOF ¶¶ 45, 50, 56. And although Dolan argues that other students were having "general conversations" about the Parkland shooting and yet were not questioned or disciplined, Pl.'s Resp. at 7, general conversations are not comparable to the reports of specific, shooting- and violence-related comments that prompted Schrammel's questioning of Dolan. Again, the record shows that Schrammel focused on Dolan not because of his disability, but rather in response to student reports about him.

Dolan also emphasizes that after Schrammel and the security officer determined that the school-shooter rumor was not credible, Schrammel and the school failed to issue a statement notifying the student body that Dolan was not a threat. Pl.'s Resp. at 5. Dolan argues that this failure effectively branded him as the "suspected school shooter," causing Dolan's peers to bully him. *Id.* (cleaned up). In addition, Dolan points to the fact that Schrammel did not create and submit a bullying report as required under the District's Bullying Prevention Response Plan, even though Dolan's mother notified Schrammel that Dolan was being bullied. *Id.* But these examples, without additional context, do not establish causation—that Schrammel's inaction was based on Dolan's disability. There is no evidence, for instance, that Schrammel or the school had *ever* issued a school-wide statement after a rumor about a student was found to be not credible. *See* Pl.'s Resp. at 5–6, 10. Similarly, it is

10

unclear whether Schrammel had ever created and submitted bullying reports for any students under the Bullying Prevention Response Plan. *See* Schrammel Dep. at 224:20–226:15. And Dolan has not presented evidence that Schrammel declined to take either action on the basis of Dolan's disability. *See, e.g.*, R. 114-1, Exh. 1 (Wardle Dep.) at 74:12–19. Without additional information to provide context to Schrammel's inactions, the evidence is insufficient to establish causation.[9]

Dolan's remaining examples suffer from the same flaw. Dolan asserts that Schrammel targeted him by prohibiting him from coming to school early; sending a security officer to check on Dolan when Dolan was sitting at a football game by himself; and admonishing Dolan for walking through the hallways too quickly (which Dolan did because of his anxiety). Pl.'s Resp. at 9–10. He also notes that Schrammel then denied his request to leave classes early so he could avoid crowds in the hallways.[10] *Id.* at 10. But even when the evidence is viewed in Dolan's favor, he has not

---

[9]Dolan has not articulated a peer-to-peer disability-based harassment argument. Instead, his briefing focuses on the District's liability for its direct treatment of Dolan: singling out Dolan, harassing him through questioning and discipline, and "creat[ing] the perception" that Dolan was a potential school shooter and then failing to correct that perception. *See* Pl.'s Resp. at 10. And as neither party has briefed peer-to-peer disability-based harassment under the ADA and the Rehabilitation Act, the issue is not considered.

[10]To the extent Dolan is raising a reasonable accommodations argument, accommodations are required only when necessary and reasonable. *CTL ex rel. Trebatoski v. Ashland Sch. Dist.*, 743 F.3d 524, 528–29 (7th Cir. 2014); *Haney v. Pritzker*, 563 F. Supp. 3d 840, 862–63 (N.D. Ill. 2021). Here, Dolan has not articulated why this accommodation was both necessary and reasonable. *See Haney*, 563 F. Supp. 3d at 863 ("An accommodation is necessary if it would affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability," and an accommodation is reasonable if "it is both efficacious and proportional to the costs to implement it." (cleaned up)); *id.* ("Determining whether an accommodation is reasonable is a highly fact-specific inquiry and requires balancing the needs of the parties." (cleaned up)).

11

shown that any of these actions were taken on the basis of his disability. Rather, the record shows that Schrammel prohibited Dolan from coming to school early because Dolan, then a freshman, would arrive so early that it was still dark outside, the school doors were still locked, and there was no adult supervision (*see* Rachael Dolan Dep. at 33:1–23; Schrammel Dep. at 89:17–90:17);[11] the security officer was merely checking in on Dolan—who was sitting not in the stands but on the grounds of the football stadium—to make sure Dolan was not hurt or upset (Schrammel Dep. at 87:22–88:15); and Dolan was admonished for walking so quickly through the hallways because he would walk forcefully and sometimes hurt other students (*see* Pl.'s SAMF ¶ 8; R. 108-7, Dep. Exh. at 0600; Schrammel Dep. at 193:4–13).

Further, Dolan asserts that the District had a "practice and pattern of disciplining students with disabilities at a much higher rate than non-disabled students." Pl.'s Resp. at 2. To support this assertion, Dolan points to statistics, comparing the percentage of the student population that are students with an IEP or a 504 plan in place (IDEA students) against the percentage of students receiving in-school and out-

---

[11]Dolan asserts that he was discriminated against because other students were allowed to arrive early all the while he was not. Pl.'s Resp. at 4. For instance, Dolan relies on his mother's deposition testimony that in contrast to Dolan, his older brother, another student at the school, was allowed to arrive to school early. *Id.*; R. 108-11, Exh. K (Rachael Dolan Dep.) at 33:1–36:12. But Dolan's brother, an upperclassman who was on the school's baseball team, arrived early to attend baseball practice. Rachael Dolan Dep. at 33:1–12. And Dolan presented no evidence that non-disabled students without a reason to be at school (like athletic practice) were allowed to arrive that early with no adult supervision present. Although Dolan's mother did testify that she would see some kids hanging around the school before classes started, she acknowledged that she did not know what reasons or school activities those students might have had for arriving early. *Id.* at 39:9–40:22.

12

of-school suspensions. *Id.* at 7–8. For instance, Dolan relies on figures showing that in the Fall of 2015, IDEA students made up only 6.6% of the student population, yet 22.7% of in-school suspensions and 29.4% of out-of-school suspensions were imposed on IDEA students that school year. *Id.* at 7.

But—to the extent Dolan is raising a disparate-impact argument—these statistics alone are insufficient to survive summary judgment. Dolan has not identified what practice or policy has allegedly caused the statistical imbalance. *Swan v. Bd. of Educ. of City of Chicago*, 2013 WL 4401439 (N.D. Ill. 2013) ("To establish a disparate impact claim, a plaintiff must … isolate and identify *specific* practices that are allegedly responsible for any observed statistical disparities." (emphasis added)); *see Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012) (in addressing an employment discrimination disparate-impact claim under Title VII, explaining that it is not enough to "point to a generalized policy" that leads to a disparate impact). Instead, Dolan merely identifies the practice by the alleged outcome—the practice "of disciplining students with disabilities at a much higher rate." Pl.'s Resp. at 2. Also, without additional context, these statistics on their own do not establish disparate-impact discrimination. *See Roberts v. City of Chicago*, 817 F.3d 561, 566 (7th Cir. 2016) (granting motion to dismiss plaintiff's disparate impact claim under the ADA because plaintiff had failed to allege that the defendant's employment screening process "caused a relevant and statistically significant disparity between disabled and non-disabled applicants" (cleaned up)). Indeed, in order to establish a disparate impact claim, a plaintiff must "establish causation by offering statistical evidence of a kind

13

and degree sufficient to show that the practice in question has caused the alleged harm because of their membership in a protected group." *Swan*, 2013 WL 4401439, at *12 (cleaned up) (quoting *Puffer*, 675 F.3d at 717). That requisite evidence is not in the record here.

In sum, even after drawing reasonable inferences in Dolan's favor, the District has shown that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law on Dolan's federal discrimination claims.[12] The District's motion for summary judgment on the Rehabilitation Act and ADA claims is granted.

### B. Emotional Distress Claim

Dolan also brought a claim for intentional infliction of emotional distress under Illinois common law, arguing that Schrammel's extreme and outrageous conduct caused him severe emotional distress. Pl.'s Resp. at 12. Because summary judgment is granted as to Dolan's federal claims, the Court relinquishes jurisdiction over Dolan's state law claim. *See* 28 U.S.C. § 1367(c)(3); *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 478 (7th Cir. 2012) (stating that "[w]hen federal claims drop out of the case," the trial court has "broad discretion to decide whether to … relinquish supplemental jurisdiction over the state-law claims"—with a "general presumption in favor of relinquishment").

---

[12] The Court reaches this conclusion without relying on the District's argument that "[u]nder Illinois law, a municipality is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." Def.'s Br. at 7.

## IV. Conclusion

Because the District has shown it is entitled to judgment as a matter of law on the Rehabilitation Act and ADA claims, its motion for summary judgment on those federal claims is granted. The Court relinquishes jurisdiction over the state-law claim.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: August 21, 2024